IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| CHRISTOPHER DEMOTTO LINSEY, | ) | |
| Petitioner, | ) ) ) | |
| v. | ) ) | NO. 3:22-cv-661 |
| BERT BOYD, Warden, | ) ) | JUDGE RICHARDSON |
| Respondent. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Petitioner Christopher Demotto Linsey filed a *pro se* petition for writ of habeas corpus ("Petition") under 28 U.S.C. § 2254, challenging his 2015 convictions in Montgomery County, Tennessee, for possession of 0.5 grams or more of cocaine with the intent to sell or deliver, simple possession of marijuana, possession of drug paraphernalia, and resisting arrest. (Doc. No. 1). Respondent has filed an Answer (Doc. No. 10), and Petitioner has filed a Reply (Doc. No. 15).

As explained below, Petitioner is not entitled to habeas corpus relief, so the Petition will be denied, and this action will be dismissed.

**I.  Motion for Status**

Petitioner has filed a Motion for Status and Notice of Change [of] Address notifying the Court of his release from prison.[1] (Doc. No. 16). The motion for status is **GRANTED** to the extent that the Court now resolves Petitioner's petition for writ of habeas corpus.

---

[1] Petitioner is on parole through 2036. TDOC ID 00235310. He therefore remains "in custody" pursuant to 28 U.S.C. § 2254(a). *See DePompei v. Ohio Adult Parole Auth.*, 999 F.2d 138, 140 (6th Cir. 1993).

## II. Procedural and Factual Background

### A. Trial and Sentencing Proceedings

The Tennessee Court of Criminal Appeals summarized the evidence presented at Petitioner's trial as follows:

On February 24, 2015, Officer Jack Williams of the Clarksville Police Department (CPD) responded to a call of a "possible trespasser" at a residence on Wesley Drive in Clarksville. Upon arrival, Officer Williams met with the caller, David Reed, III, and walked around Mr. Reed's property looking for evidence of the trespasser. While walking through the back yard of Mr. Reed's residence, Officer Williams noticed the smell of burnt marijuana. Although Mr. Reed said that he did not smell anything, other officers on the scene stated that they too smelled marijuana. Officer Williams walked toward the house next door, and the smell of burnt marijuana became stronger. Finding no evidence of a trespasser, the officers left Mr. Reed's residence.

Later that evening, Officer Williams and two other officers conducted a knock and talk at the residence next door to Mr. Reed's. As he approached the front door, Officer Williams again smelled the odor of marijuana and noticed someone looking out the front window at him. At that time, the owner of the residence, Tiffany Holliday, came out of the house and quickly closed the front door behind her. When Ms. Holliday asked what the officers were doing there, Officer Williams asked her about the smell of marijuana and asked for consent to search the house, which Ms. Holliday denied. Officer Williams asked, "Who else [is] in the residence?" Ms. Holliday stated that her brother, Timothy Holliday, and her five children were inside. Officer Williams asked if he could step inside the house to speak with her, but Ms. Holliday stated that "she could bring everybody outside" and told the officer that her friend "Crook" was also in the residence. Officer Williams again asked to step inside to talk because the weather was "below freezing" and he did not want her to bring her children outside in the cold weather, and Ms. Holliday allowed the officers into the residence. Once inside, Officer Williams could smell the odor of burnt marijuana and asked Ms. Holliday to gather the occupants of the residence into the living room. The Defendant and four other men came out of a "bonus room," which was a converted garage at the back of the residence. Officer Williams obtained consent from Ms. Holliday for a "protective sweep" of the residence to ensure that no one else was inside the home. He then contacted the CPD's "on-call drug agent," Agent Robert DelGiorno, and advised him of the situation. Agent DelGiorno said that he would apply for a search warrant and requested that Officer Williams wait with the occupants of the residence in the living room.

Based on his discussions with Officer Williams, Agent DelGiorno prepared an application for a search warrant, which was granted by a judge. The search warrant covered not only the residence but also included a search of the individuals inside

the residence, including the Defendant. Agent DelGiorno and three other drug agents—Will Evans, Griffie Briggs, and Lon Chaney—arrived at Ms. Holliday's residence with a search warrant. Agent DelGiorno initially spoke to Ms. Holliday and explained to her that he had a search warrant. He then instructed the other agents to search the residence. While searching the bonus room, the agents looked under the chairs and couches in the room. Agent Evans found a small baggie containing a "white powdery substance," which had been "stuffed" in the side of a couch. The agents also found a "marijuana grinder," a digital scale, and five or six marijuana "roaches." In the back bedroom, a second digital scale was recovered. Agent DelGiorno took photographs of the contraband, and he conducted a field test of the roaches, which indicated that the roaches contained marijuana. Agent DelGiorno stated that the baggies found in the jacket worn by the Defendant [as discussed below] were commonly used in the distribution or sale of narcotics, specifically crack cocaine and marijuana. One of the digital scales was found in the bonus room. He testified that digital scales are commonly used to weigh narcotics.

After the agents completed their search of every room except the living room, Agent DelGiorno asked Officer Williams to move the occupants to the bonus room. Before moving the Defendant, Officer Williams briefly searched him and found nothing on the Defendant's person. However, Officer Williams then searched a jacket lying on top of a table that the Defendant had been wearing when officers first arrived. Officer Williams found "multiple clear plastic baggies" in a front pocket of the jacket. Based on his training, Officer Williams knew that the baggies were commonly used to package narcotics and turned them over to Agent DelGiorno. He then escorted the Defendant to the bonus room.

Because of the number of potential defendants at the residence, Agent DelGiorno decided to conduct strip searches of the occupants before transporting anyone to the police department. Agent DelGiorno and Agent Chaney conducted a strip search of the Defendant first. They instructed the Defendant to remove one piece of clothing at a time until he was "completely disrobed." At this time, Agent Evans entered the bonus room and "saw [a] plastic baggie protruding from [the Defendant's] butt cheeks." Agent Evans knew from his training that defendants commonly conceal narcotics between their butt cheeks. He told the Defendant, "...I can see it sticking out of your butt cheeks, just go ahead and pull it out for us." Agent DelGiorno also saw the baggie and reached over to detain the Defendant, but the Defendant pulled away from Agent DelGiorno and lunged towards the back door. Hearing "a commotion," Agent Briggs and Officer Williams entered the bonus room and saw the Defendant on the ground with three officers attempting to handcuff the Defendant. The Defendant had "locked up his hands up against his body so the agents could not put his hands into handcuffs." Additionally, the Defendant's "buttocks area was clenched very tightly and then he was kicking ... his lower extremity of his legs." After a short struggle, the Defendant was placed into handcuffs, and Agent Briggs observed "a small bag containing a white crystalline substance[,]" laying on the ground in the area of the couch that had just been searched. Agent Briggs photographed and collected the baggie and the Defendant's cell phone. The officers helped the Defendant put back on his clothes,

but they "duck taped his pants" at the ankles because they believed that "there may still be contraband inside his butt cheeks." The Defendant was then transported to the jail, where another strip search was conducted.

The evidence recovered in the execution of the search warrant was sent to the Tennessee Bureau of Investigation (TBI) Crime Laboratory for testing. Special Agent William Stanton analyzed the small baggie containing a white crystalline substance that was found on the ground under the couch after the Defendant's strip search. Agent Stanton determined that the substance inside the baggie contained cocaine base and weighed 1.98 grams.

CPD Detective Deborah Kolofsky obtained a search warrant for the Defendant's cell phone. Detective Kolofsky performed a forensic examination of the cell phone and prepared an extraction report, which included text messages sent from and received by the Defendant's cell phone. Agent Chaney, who in the course of his work as a narcotics agent was familiar with "street slang" associated with drug sales, reviewed the extraction report provided by Detective Kolofsky. Upon review, he identified several text message exchanges that contained slang words associated with the drug trade. In one exchange, the Defendant received a text message that stated, "Bring me a 40 of the new when we get there. If not, long." Agent Chaney testified at trial that the request for "a 40" meant that a buyer wanted four-tenths of a gram of crack cocaine for forty dollars. There was a second message several days later from the same person again stating, "Bring me a 40[.]" Agent Chaney explained that it was typical for drug customers to request the same amount from a dealer each time. Another text message sent to the Defendant contained the phrase "loud 900." According to Agent Chaney, "'Loud' is a common slang term for high-grade marijuana and nine hundred would indicate a half pound price for that." Another incoming message asked the Defendant, "What you letting [sic] 3 5 go for?" Agent Chaney explained that the term "3 5" referred to the weight of an eight-ball, which was commonly used in the selling of marijuana and cocaine. In another exchange, an incoming message asked the Defendant, "You got some smoke?" According to Agent Chaney, "smoke" referred to marijuana. Finally, the extraction report contained an exchange in which the Defendant asked, "How was it?" The Defendant received a response that said, "It wasn't bad. It wasn't any p***y work." Agent Chaney stated that the term "work" referred to crack cocaine.

Agent Chaney was familiar with the street value of crack cocaine in Clarksville based on his training and experience. He testified that crack cocaine is priced on a ten-scale, with a tenth (0.1) of a gram costing ten dollars. He stated that in Clarksville the most common and popular order for crack cocaine a twenty dollar crack rock—or 0.2 grams. Agent Chaney said that possessing 2.0 grams was "generally indicative of sales where they can break that rock up and sell [twenty] rocks out of it." He stated that the 1.98 grams of crack cocaine found in the Defendant's possession had a street value of about $200. Agent Chaney also testified that the baggies found in the Defendant's jacket were consistently used in drug transactions and, specifically, in the sale of crack cocaine. Based on this evidence, a jury convicted the Defendant of possession of 0.5 grams or more of

cocaine with the intent to sell or deliver, simple possession of marijuana, possession of drug paraphernalia, and resisting arrest on November 24, 2015.

(Doc. No. 9-10 at PageID# 576−79) (footnotes omitted, brackets retained); *State v. Linsey*, No. M2017-00059-CCA-R3-CD, 2018 WL 557927 (Tenn. Crim. App. Jan. 24, 2018).

At sentencing, the prosecution introduced evidence of Petitioner's seven prior felony offenses. (*Id.* at PageID# 579.) The presentence report also set forth Petitioner's prior misdemeanor convictions for simple possession of marijuana, simple possession of cocaine, violation of open container law, contributing to the delinquency of a minor, evading arrest, and vandalism up to $500. (*Id.*) The trial court sentenced Petitioner to prison terms of 23 years for possession of 0.5 grams or more of cocaine with the intent to sell or deliver, 11 months and 29 days for possession of marijuana, 11 months and 29 days for possession of drug paraphernalia, and 6 months for resisting arrest. (*Id.* at PageID# 580.) The court ordered all counts to run concurrently with one another but consecutively to Petitioner's 12-year sentence in a prior case. (*Id.*).

### B. Direct Appeal

Trial counsel did not file a motion for new trial. (*Id.*) Eleven months after judgment was entered, trial counsel filed a motion to withdraw, which the trial court granted. (*Id.*). Petitioner then filed an untimely notice of appeal. (*Id.*) The Tennessee Court of Criminal Appeals waived the 30-day notice of appeal deadline and considered his appeal on the merits. (*Id.*)

On direct appeal, Petitioner argued that he was convicted of possession of 0.5 grams or more of cocaine with intent to sell or deliver based on insufficient evidence. (Doc. No. 9-8 at PageID# 540−42). He also argued that his sentence was excessive as a matter of Tennessee law. (*Id.* at PageID# 543−45). The Tennessee Court of Criminal Appeals affirmed the trial court's judgment (Doc. No. 9-10), and the Tennessee Supreme Court denied permission to appeal (Doc. No. 9-13).

### C. State Postconviction Review

The Tennessee Court of Criminal Appeals summarized Petitioner's postconviction proceedings in the trial court as follows:

> On November 8, 2018, the Petitioner filed a timely pro se petition for post-conviction relief. Following the appointment of post-conviction counsel, the Petitioner filed an amended petition in which he alleged that trial counsel was ineffective for, among other things, failing to plead crucial defense motions, failing to properly object to the admission of evidence at trial, and failing to preserve the Petitioner's appellate rights by not filing a timely motion for new trial.
>
> At the July 15, 2020, evidentiary hearing, trial counsel testified that the instant case was the second of two[] back-to-back cases in which she had represented the Petitioner on similar charges. Due to the passage of time and the similarity between the cases, she could not remember a lot of the details surrounding the instant case. She was unable to recall if she had been appointed or retained[] and could not remember any questions about a video at the preliminary hearing. However, upon being shown a portion of the transcript, she acknowledged that there had been questions about a possible video recorded by one of the patrol officers. She could not recall if the video was ever produced.
>
> Trial counsel testified that she filed a motion to suppress on the grounds that the search of the Petitioner's person was unconstitutionally intrusive and unlawful. She said the motion was denied following a hearing. She could not recall why she did not include in her motion a challenge to the validity of the search warrant itself. She also could not recall if she presented any evidence at the suppression hearing about the possible officer-recorded video.
>
> When asked why she had not filed a motion to suppress the evidence obtained from the Petitioner's cell phone, she replied that she was not sure if the Petitioner ever mentioned that there was any evidence on his phone. She also "guess[ed] it was just a defense tactic[.]" She thought the search of the cellphone was probably included as part of the initial search warrant[] but could not recall with certainty. She acknowledged that there was a lot of trial testimony about what had been found on the phone but said she did not believe the evidence on the phone was what led to the Petitioner's conviction.
>
> Trial counsel could not remember any specific objections she raised at trial. She could not recall the State's motion to substitute photographs of some of the evidence instead of the physical evidence itself but indicated she would not have had a problem with that common practice.
>
> Trial counsel recalled that the Petitioner had been in jail during the course of her representation. She could not remember how many times she visited him in jail but did recall that she spoke often with his wife, who relayed information to the

Petitioner on her behalf. Trial counsel explained that the Petitioner's wife visited him frequently and that the most efficient method for counsel to communicate with him was through his wife. Trial counsel was certain, however, that she met at least a few times with the Petitioner for trial preparation, with each meeting lasting at least an hour, if not more.

Trial counsel testified that the Petitioner and his wife had hired her to handle the appeal for his first case and therefore knew that they had to make a payment for her to handle the appeal in the instant case, but they did not do so. In the meantime, on December 9, trial counsel received the devastating news that her mother had died. Trial counsel repeated that the Petitioner understood that he had to hire her if he wanted her to handle the appeal because the instant case was "his second rodeo." Because she was back home in Kansas and unavailable during that time, she had no idea if the Petitioner ever contacted her law office about the motion for new trial and appeal.

On cross-examination, trial counsel agreed that she based her motion to suppress on the issue that she thought had the best chance of success, which was the officers' unlawful detainment and strip search of the Petitioner in the home. In her opinion, the substantial amount of cocaine recovered during the strip search was the most damaging evidence against the Petitioner at trial.

Trial counsel could not recall any issue about a video, or that any videos were introduced at trial. She said the Petitioner did not ask her to investigate or call any witnesses at trial. She stated that she was unaware of any legal bases for a successful challenge to the search of the cell phone or the validity of the search warrant. On redirect examination, she acknowledged that the text messages on the Petitioner's phone implicated him in the sale of cocaine.

The Petitioner testified that trial counsel met with him only twice at the jail, for approximately an hour each time. He recalled asking trial counsel about the video, which Officer Williams had mentioned at the preliminary hearing. To his knowledge, trial counsel never requested that the video be produced or even talked about it again. The Petitioner did not think he ever specifically asked trial counsel to seek production of the video. He believed, however, that the video could have been used to refute Officer Williams' trial testimony that the Petitioner had been wearing the jacket in which the plastic baggies and the cell phone were found.

The Petitioner testified that the search warrant for the phone was separate from the search warrant for the residence and its occupants. He said he and trial counsel did not discuss filing a motion to suppress the results of the search of the phone.

The Petitioner testified that officers provided inconsistent testimony about where the two digital scales had been found. He said he did not discuss that inconsistency with trial counsel, but he did ask her why she did not object to other things, and she responded that she wanted "everything to be on record for appeal purposes." He was unable to provide any specific examples of times that he had wanted her to

object, suggesting that there were so many different occasions that he could not name one. He testified that trial counsel only raised one objection during the entire trial, but he could not remember what it was about.

The Petitioner testified that trial counsel never informed him of how much time he was potentially facing. He said he believed that trial counsel's failure to adequately communicate with him about the case prevented him from properly assisting in the defense. He stated that he knew that trial counsel failed to file a motion for new trial[] but was unaware of the reason until her evidentiary hearing testimony.

On cross-examination, the Petitioner testified that, according to Officer Williams' preliminary hearing testimony, a patrol officer had made a video that showed the officer's approach and entry into the residence. He testified that he did not see the officer videotaping but was relying on what Officer Williams said about it at the preliminary hearing. He acknowledged that he had never seen the video and had no independent knowledge that it existed.

On July 21, 2020, the post-conviction court entered an order denying the petition.

(Doc. No. 8-23 at PageID# 1181−84).

On appeal from the denial of postconviction relief, Petitioner argued that trial counsel was ineffective for failing to:

- file a motion to suppress evidence recovered from Petitioner's cell phone;

- object to various evidence presented at trial; and

- file a motion for new trial.

(Doc. No. 9-17 at PageID# 1144−51). The Tennessee Court of Criminal Appeals affirmed (Doc. No. 9-20), and the Tennessee Supreme Court denied permission to appeal (Doc. No. 9-23).

### D. Federal Habeas Corpus Petition

Petitioner next filed his Petition in this Court, raising the following grounds for relief:

1) Petitioner's conviction for possession of 0.5 grams or more of cocaine with intent to sell or deliver was based on insufficient evidence;

2) Petitioner's sentence was excessive in violation of the Eighth Amendment;

3) trial counsel was ineffective for failing to file a motion to suppress evidence recovered from Petitioner's cell phone;

4) trial counsel was ineffective for failing to object to evidence presented at trial; and

5) trial counsel was ineffective for failing to file a timely motion for new trial.

(Doc. No. 1 at PageID# 4−11). The Petition is fully briefed and ripe for review. (Doc. Nos. 10, 15).

### III. Governing Standards

A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The AEDPA imposes both procedural and substantive limits on the Court's authority to grant habeas corpus relief for a petitioner in custody pursuant to a state court judgment. *See Brown v. Davenport*, 596 U.S. 118, 132−34 (2022). The Court sets forth below the standards applicable to this Petition.

#### A. Procedural Default

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court . . ., thereby alerting that court to the federal nature of the claim." *Id.* (citation omitted). In Tennessee, a petitioner is "'deemed to have exhausted all available state remedies for [a] claim'" when the claim is presented to the Tennessee Court of Criminal Appeals. *Adams v. Holland*, 330 F.3d 398, 401 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39).

A procedural default can occur in one of two ways. First, a procedural default may occur if the state court actually "relied on [a state] procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U. S. 320, 327 (1985). Second, if a petitioner

fails to properly exhaust a claim in state court, and the claim can no longer be raised in state proceedings because of a failure to follow state procedure for presenting such a claim, the claim is "technically exhausted" but procedurally defaulted. *Woodford v. Ngo*, 548 U. S. 81, 126 (2006).

A petitioner may obtain merits review of a procedurally defaulted claim by demonstrating "cause and prejudice" for the default. *Sutton v. Carpenter*, 745 F.3d 787, 791 (6th Cir. 2014). To establish cause, the petitioner must show that "some objective factor external to his defense impeded his ability to comply with the state's procedural rule." *Bies v. Sheldon*, 775 F.3d 386, 396 (2014). In Tennessee and many other states, a petitioner who raises a procedurally defaulted claim alleging ineffective assistance of trial counsel may demonstrate cause by showing that postconviction counsel was ineffective for failing to raise the claim in initial state postconviction proceedings. *See Martinez v. Ryan*, 566 U.S. 1, 17 (2012) ("Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective."); *Trevino v. Thaler*, 569 U.S. 413, 429 (2013) (extending *Martinez* to states with procedural frameworks that make unlikely a meaningful opportunity to raise ineffective assistance claim on direct appeal); *Sutton*, 745 F.3d at 795−96 (holding that *Martinez* and *Trevino* apply in Tennessee).

To demonstrate cause under this framework, a petitioner must show that "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 14. To establish prejudice under the "cause and prejudice" analysis, a petitioner must demonstrate that the constitutional error

"'worked to his actual and substantial disadvantage.'" *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis omitted)).

Alternatively, a petitioner may obtain merits review of a procedurally defaulted claim by showing that failure to consider the claim would result in a fundamental miscarriage of justice. *Williams v. Bagley*, 280 F.3d 932, 966 (6th Cir. 2004) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

### B. Merits Review

Under the AEDPA, a federal court may grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court only if that adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

If a claim was not adjudicated on the merits in state court, and yet for whatever reason does receive adjudication on the merits in this Court, this Court applies the "pre-AEDPA standard of review: *de novo* for questions of law (including mixed questions of law and fact), and clear error for questions of fact." *Robinson v. Howes*, 663 F.3d 819, 823 (6th Cir. 2011); *see* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

## IV. Analysis

**A. Sufficiency of the Evidence**

In Ground 1, Petitioner contends that his conviction for possession of 0.5 grams or more of cocaine with intent to sell or distribute was based on insufficient evidence. The Tennessee Court of Criminal Appeals reasonably held to the contrary, and 28 U.S.C. § 2254 therefore bars relief.

Supreme Court precedent clearly establishes that a defendant may not be convicted of a crime "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged." *In re Winship*, 397 U.S. 358, 364 (1970). When a defendant challenges the sufficiency of the evidence underlying his conviction, the reviewing court must apply substantial deference to the jury verdict: "[T]his inquiry does not require a court to ask whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphases retained) (quotation marks and citation omitted). On federal habeas review, a second layer of deference is added to this already deferential standard:

> [A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable. Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

*Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam) (quotation marks and citation omitted).

In rejecting Petitioner's sufficiency-of-the-evidence argument, the Tennessee Court of Criminal Appeals held as follows:

> With regard to a determination of intent to sell or deliver, proof of intent usually consists of circumstantial evidence and the inferences that can be reasonably drawn

from that evidence. It is permissible for the jury to infer from the amount of a controlled substance or substances possessed by the defendant, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or delivering. Tenn. Code Ann. § 39-17-419 (2015).

In the present case, the evidence showed that during a strip search of the Defendant, Agent Evans and Agent DelGiorno saw a plastic baggie in between the Defendant's butt cheeks. When the agents requested that the Defendant remove the item, he resisted and lunged for the back door. Following a short struggle while agents attempted to handcuff the Defendant, Agent Briggs observed "a small bag containing a white crystalline substance," laying on the ground in the area of the couch that had just been searched. A forensic scientist with the TBI analyzed the substance and determined that it was cocaine base and that it weighed 1.98 grams. Agent Chaney testified that 1.98 grams of crack cocaine had a street value of approximately $200. Agent Chaney further testified that that [sic] possessing 2.0 grams was "generally indicative of sales where they can break that rock up and sell [twenty] rocks out of it." Agents also discovered items commonly used in the drug trade, including additional plastic baggies inside a jacket worn by the Defendant and a digital scale located in the bonus room where the Defendant had been when Officer Williams first arrived. Finally, Agent Chaney testified that many of the text messages retrieved from the Defendant's cell phone indicated that the Defendant was selling or delivering drugs. When viewed in the light most favorable to the State, the evidence overwhelmingly supports the Defendant's conviction for possession of 0.5 grams or more of cocaine with intent to sell or deliver.

(Doc. No. 9-10 at PageID# 582) (some citations omitted).

A reasonable jury could have found based on the totality of evidence presented at trial—including the quantity of cocaine in Petitioner's possession, the plastic baggies in his jacket, and the scale in the bathroom where Petitioner was present when law enforcement arrived—that Petitioner was guilty of possession of 0.5 grams or more of cocaine with to sell or deliver. Because the Tennessee Court of Criminal Appeals reasonably concluded as much, Petitioner is not entitled to habeas corpus relief on this claim.

### B. Excessive Sentence

In Ground 2, Petitioner contends that his sentence is excessive in violation of the Eighth Amendment. (Doc. No. 1 at PageID# 6−7). His constitutional claim is procedurally defaulted and is denied on that basis.

Petitioner presented a sentencing argument in the Tennessee Court of Criminal Appeals on direct appeal, but he argued it exclusively on state-law grounds, not mentioning the Eighth Amendment or arguing any Eighth Amendment standards. (Doc. No. 9-8 at PageID# 543−45) (arguing that trial court abused its discretion and failed to impose the least restrictive sentence to achieve the purposes of criminal sentencing, as required by Tennessee statute). Because Petitioner failed to "alert" the state court "to the federal nature of [his] claim," he has defaulted it. *Baldwin*, 541 U.S. at 29. Acknowledging the default, Petitioner argues in his Reply that the Court should consider the merits of his claim pursuant to the fundamental-miscarriage-of-justice (or "actual innocence") exception. (Doc. No. 15 at PageID# 1253−56).

No binding precedent establishes whether the "actual innocence" exception applies to claims of noncapital sentencing error like Petitioner's. *See Dretke v. Haley*, 541 U.S. 386, 388 (2004) ("We are asked in the present case to extend the actual innocence exception to procedural default of constitutional claims challenging noncapital sentencing error. We decline to answer the question in the posture of this case . . . ."); *Gibbs v. United States*, 655 F.3d 473, 478 (6th Cir. 2011) ("This court has not yet issued a published opinion that addresses whether the actual innocence exception extends to noncapital sentences, but we have in two unpublished opinions rejected claims similar to that of Gibbs. Because it is not necessary to resolve whether the 'actual innocence' exception extends to the noncapital sentencing context, however, we do not address it squarely in this case." (citations omitted)). Assuming arguendo that the exception applies, Petitioner can take advantage of it only if he was factually ineligible for the sentence imposed. *Gibbs*, 655 F.3d at 478−79 ("To show actual innocence in the sentencing context, the petitioner must show by clear and convincing evidence that, but for a constitutional error, no

reasonable juror would have found the petitioner eligible for the penalty under the applicable law." (quotation marks, brackets, and ellipses omitted)).

Petitioner makes no such showing here. He argues that because the sentencing court took into account his prior conviction for evidence tampering—a conviction that was later vacated on appeal—he is entitled to a resentencing hearing where the court would not be permitted to consider that conviction. (Doc. No. 1 at PageID# 6−7; Doc. No. 15 at PageID# 1252). But he does not argue, let alone demonstrate, that was factually *ineligible* for the sentence he received. Thus, even if the actual innocence exception might apply to excuse the procedural defaults of some noncapital sentencing claims, Petitioner cannot rely on it here. His sentencing claim is therefore denied based on procedural default.

## C. Ineffective Assistance of Trial Counsel

Petitioner's remaining grounds for relief each allege ineffective assistance of trial counsel. The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees to a person accused of a crime the right to effective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant. *See Bell v. Cone*, 535 U.S. 685, 694−95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness. *See Strickland v. Washington*, 466 U.S. 668, 686−87 (1984). The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

1. Failure to file a motion to suppress cell phone evidence

In Ground 3, Petitioner contends that trial counsel was ineffective for failing to file a motion to suppress evidence collected from his cell phone.

The Court need not address the adequacy of counsel's performance in this regard, because Petitioner has not shown that the state court's determination on *Strickland*'s prejudice prong was unreasonable. *Jones v. Bagley*, 696 F.3d 475, 490 n.8 (6th Cir. 2012) ("Because a petitioner must show both *Strickland* prongs in order to gain relief, if the prejudice prong demonstrates that the petitioner is not entitled to relief we need not analyze the competence prong."). Indeed, in the Tennessee Court of Criminal Appeals, Petitioner did not present any argument for why a motion to suppress the cell phone evidence would have succeeded. (*See* Doc. No. 9-17 at PageID# 1146−48). The Tennessee Court of Criminal Appeals therefore reasonably found no prejudice and denied relief in part on that basis. (Doc. No. 9-20 at PageID# 1187).

In his federal habeas petition, Petitioner proposes arguments that he believes trial counsel should have raised in a motion to suppress the cell phone evidence. (Doc. No. 1 at PageID# 7−9). Respondent contends that these new arguments are procedurally defaulted. (Doc. No. 10 at PageID# 1230−31). Petitioner contends that postconviction counsel's ineffectiveness excuses the default. (Doc. No. 15 at PageID# 1259−60 (citing *Sutton v. Carpenter*, 745 F.3d 787 (6th Cir. 2014)). The Court need not resolve the procedural default question, because Petitioner's claim fails on the merits. *See Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) ("[F]ederal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits.").

Petitioner argues that a motion to suppress the cell phone evidence would have succeeded because law enforcement's initial protective sweep of the home and the three-to-four-hour seizure

of Petitioner and others in the home violated the Fourth Amendment. (Doc. No. 1 at PageID# 8). But trial counsel presented (at least orally, during oral argument before the trial court) these same arguments in support of Petitioner's motion to suppress evidence of drugs and other items seized during the initial search of Petitioner's person and the home where he was arrested. (Doc. No. 9-15 at PageID# 1069−70) ("[T]he officers used a protective sweep—an illegal protective sweep for—there was absolutely no cause to ask for a protective sweep. . . . They were all detained for about four hours waiting on a search warrant with the officers presen[t] in the home.") (apostrophe omitted). These arguments proved unsuccessful. (Doc. No. 9-1 at PageID# 135 (order denying motion to suppress); *see* Doc. No. 9-20 (Tennessee Court of Criminal Appeals holding on postconviction review that the officers' detention of Petitioner and others in the home was reasonable under the Fourth Amendment)). Trial counsel was therefore not ineffective for failing to make the same arguments in support of a motion to suppress cell phone evidence that was obtained as a result of Petitioner's arrest. *Tackett v. Trierweiler*, 956 F.3d 358, 375 (6th Cir. 2020) ("The failure to raise a meritless claim does not constitute ineffective assistance of counsel.").

2. Failure to object to evidence at trial

In Ground 4, Petitioner contends that trial counsel was ineffective for failing to object to the introduction of photographs and other evidence at trial. (Doc. No. 1 at PageID# 9−10) ("The State introduced at trial several photographs without authentication, cell phone report without authentication, hearsay witnesses, and evidence with broken chain of custody which led the Petitioner's conviction of intent to sell or deliver. Petitioner's counsel failed to object any of herein mentioned evidence at trial.").

The Tennessee Court of Criminal Appeals considered and rejected this claim on postconviction review:

> The Petitioner, likewise, merely speculates that trial counsel may have been successful had she had raised objections at trial to the authentication of the photographs, authentication of the cell phone report, chain of custody of the evidence, and hearsay testimony by the witnesses, asserting that "[m]uch like her failure to address the issue of suppressing the cell phone, we cannot know the real outcome of the trial because trial counsel's deficient performance so drastically undermined it." The Petitioner does not identify any problems with hearsay testimony, the chain of custody, or authentication of the photographs or cell phone report, and our review of the trial record does not reveal any problems that counsel failed to address that would have altered the outcome of the case.

(Doc. No. 9-20 at PageID# 1187).

The state court's conclusion was not legally or factually unreasonable. Indeed, Petitioner's brief on postconviction appeal cites no legal authority or legal standard to support an argument that any objection to the referenced evidence would have been successful. (Doc. No. 9-17 at PageID# 1148−49). Likewise, in his Petition and Reply in these proceedings, Petitioner does not cite any case or present any legal standard for why any of the listed evidence was improperly admitted—let alone why exclusion of that evidence would have created a reasonable probability of a different result at trial. He has therefore failed to show that the Tennessee Court of Criminal Appeals unreasonably denied his claim for failure to demonstrate prejudice.

### 3. Failure to file a timely motion for new trial

In Ground 5, Petitioner contends that trial counsel was ineffective for failing to file a timely motion for new trial. (Doc. No. 1 at PageID# 10−11). On postconviction review, the Tennessee Court of Criminal Appeals held that counsel's failure constituted deficient performance but denied Petitioner's claim for lack of prejudice. (Doc. No. 9-20 at PageID# 1187−91). In his federal habeas corpus petition, Petitioner argues that counsel, by failing to file a motion for new trial, "abandoned the [in]sufficiency of evidence on simple possession of marijuana, on possession of paraphernalia, and resisting arrest; Prosecutorial Misconduct, Trial Court's Jury Instruction Error, and failure to

subpoena Ms. Holiday as a witness." (*Id.* at PageID# 10 (brackets retained); *see* Doc. No. 15 at PageID# 16−17).

Under Tennessee law, if a defendant fails to file a timely motion for new trial, "all issues are deemed waived [on direct appeal] **except for sufficiency of evidence** and sentencing." *State v. Bough*, 152 S.W. 3d 453, 460 (Tenn. 2004) (citations omitted; emphasis added). Thus, trial counsel's failure to file a motion for new trial did not prevent Petitioner from arguing sufficiency of the evidence on direct appeal. Indeed, he argued that one of his convictions was based on insufficient evidence, and the Tennessee Court of Criminal Appeals considered that argument on the merits before rejecting it. (Doc. No. 9-10 at PageID# 581−82). As for the other issues that trial counsel purportedly abandoned, Petitioner has failed to demonstrate a reasonable probability of success. Indeed, he provides no legal or factual argument to explain why any of these issues might have resulted in reversal on appeal or success of the motion for new trial. (Doc. No. 1 at PageID# 10; Doc. No. 15 at PageID# 16−17). The Tennessee Court of Criminal Appeals thus reasonably held that Petitioner failed to demonstrate prejudice as to this aspect of counsel's performance.

In summary, Petitioner has failed to demonstrate that he is entitled to habeas corpus relief on any of his claims that trial counsel was ineffective.

## V. Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas corpus petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner

satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Here, jurists of reason would not disagree about the Court's resolution of Petitioner's claims. A certificate of appealability therefore will not be granted in this Court, but Petitioner may seek one in the Sixth Circuit.

## VI. Conclusion

As discussed above, the Court **DENIES** Petitioner's 28 U.S.C. § 2254 petition for writ of habeas corpus and **DISMISSES** this action with prejudice. A certificate of appealability is **DENIED**. This is the final order in this case, and because it denies all relief, the Clerk **SHALL** enter judgment. *See* Fed R. Civ. P. 58(b)(1)(C).

IT IS SO ORDERED.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE